# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  1:17-CR-189-MHH-HNJ** |
| | } | |
| **JOSHUA SCOT WEST,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Defendant Joshua Scot West filed a motion to suppress evidence obtained as a result of a January 19, 2017 traffic stop that took place in Anniston, Alabama. (Doc. 14).  The motion pertains to evidence found during a warrantless search of Mr. West's pickup truck and statements that Mr. West made after he was arrested but before he received a *Miranda* warning.  Officer Grant Williams initiated the traffic stop.  Officer Preston  Sorrell joined Officer Williams at the scene of the stop and conducted the initial warrantless search of Mr. West's truck.  And after Mr. West's temporary detention ripened into an arrest, Officer Justin Hise and Officer Sorrell questioned Mr. West about the drugs that Officer Williams and Officer Sorrell found in the pickup truck, even though none of the officers had advised Mr. West of his rights before the questioning began.

Magistrate Judge Johnson reviewed the evidence relevant to Mr. West's motion to suppress and issued a report in which he recommended that the Court grant in part and deny in part the motion. (Doc. 28). Mr. West has objected to portions of Judge Johnson's report. (Doc. 29). This opinion resolves Mr. West's objections.

## STANDARD OF REVIEW

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). "The district judge must consider *de novo* any objection to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3).

When a law enforcement officer conducts a warrantless search, to avoid suppression of evidence obtained during the search, the United States must prove that the search falls within the scope of one of the recognized exceptions to the Fourth Amendment's warrant requirement. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008); *United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002). The United States also must establish that an exception to the advice of rights requirement of *Miranda v. Arizona*, 384 U.S. 436 (1996), applies to make admissible information that Mr. West provided to police before he received a *Miranda* warning. *Missouri v. Seibert*, 542 U.S. 600, 608 n. 1 (2004).

**ANALYSIS**

Mr. West argues that, contrary to the findings in the report and recommendation, the warrantless search that led to the discovery of suspected illegal drugs in his truck violated his rights under the Fourth Amendment, and his statements regarding the suspected heroin that police found in his truck are inadmissible because the "public safety" exception to *Miranda* does not apply on the record in this case. The Court considers these objections in turn.

## I.    Warrantless Vehicle Search

Mr. West objects to the finding that the initial warrantless search of his pickup truck during a traffic stop was a proper protective search based on a reasonable suspicion that he was armed and dangerous. Protective searches of vehicles generally are premised in part on the settled proposition that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long,* 463 U.S. 1032, 1047 (1983). When a law enforcement officer "has a reasonable belief 'that the individual whose suspicious behavior he is investigating is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'" *Long*, 463 U.S. at 1047 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 (1968)). As is the case with every Fourth

Amendment challenge to police conduct, "the central inquiry" is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry*, 392 U.S. at 19.

To determine whether Officer Sorrell's search of the passenger compartment of Mr. West's pickup truck under the reasonable suspicion standard violated Mr. West's rights under the Fourth Amendment, the Court must distance itself from what actually motivated Officer Sorrell to search and instead consider the extent to which Officer Sorrell reasonably would suspect that Mr. West was "armed and presently dangerous" under the circumstances that existed at the time of the search. *Whren v. United States*, 517 U.S. 806, 813 (1996) (If "the circumstances, viewed objectively," justify a search, then the officer's actual motivation will not invalidate the search).

The circumstances surrounding the protective search are these: Mr. West committed a traffic violation; he ran a red light.[1] Officer Williams saw Mr. West run the red light. Officer Williams activated his blue lights to initiate a traffic

---

[1] Judge Johnson's report contains a thorough statement of the facts relevant to Mr. West's suppression motion. The Court sets out the facts here to provide context for the discussion that follows and to address Mr. West's objections to Judge Johnson's factual findings. For the most part, the Court has omitted record cites in this opinion because the citations are available in Judge Johnson's report.

stop.[2]  As Officer Williams followed Mr. West's pickup truck, Officer Williams

noticed that the truck did not have a valid Alabama tag.  (Doc. 22, p. 16).  Mr.

West stopped approximately two blocks from the intersection where he ran the

traffic light.[3]

When Mr. West pulled over, he opened the driver's side door and began to

step out of his pickup truck.  Officer Williams instructed Mr. West to stay in the

truck and approached the driver's side of the truck.  Mr. West cooperated with

Officer Williams; Mr. West stayed in the truck, and he responded when Officer

Williams asked him to provide his driver's license and insurance card.  Mr. West

had difficulty finding the registration for his truck, and he spent a few minutes

_____

[2] "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  *Whren v. U.S.*, 517 U.S. 806, 810 (1996).

[3] It is not clear from the record when, in the space of approximately two blocks, Officer Williams activated his blue lights, and Officer Williams cannot say when, in the space of the two blocks, Mr. West became aware of him.  (Doc. 22, pp. 37-38).  The lack of clarity is significant to Mr. West because in identifying the conduct that supports the protective search, the United States points to the fact that Mr. West did not pull over immediately.  Officer Sorrell testified that when people need to hide contraband, "they will drive until they get it hidden or destroyed . . .."  (Doc. 22, p. 90).  To prove that Officer Williams did not activate his blue lights immediately, Mr. West cites testimony from Officer Williams to the effect that the dashcam in his patrol car activates when the blue lights activate, and the camera records events that occurred "a few minutes" before he activates the blue lights.  (Doc. 22, p. 44 ("[T]hat particular camera system will kick in a few minutes before it – it prerecords a certain length of time before I activate my emergency lights."); Doc. 29, p. 25; Doc. 33-1, p. 1).  The dashcam recording of Mr. West's traffic stop does not begin until Mr. West stopped his pickup truck.  Mr. West objects to a footnote in the report and recommendation that describes the operation of the dash camera because the footnote does not include this detail.  (Doc. 29, p. 25).  The Court sustains the objection.  Because the Court may resolve Mr. West's constitutional challenge by focusing on conduct that occurred after Mr. West stopped his pickup truck, the Court disregards the dispute about the timing of the stop.

flipping through a large envelope filled with papers, looking for the document. (Doc. 22, pp. 22, 60-61, 87, 116).[4]  Officer Williams told Mr. West not to worry about the registration, and he walked to his squad car to consult with dispatch. These events are captured on the recording from Officer Williams's body camera.[5]

Officer Sorrell arrived at the stop just after Officer Williams.  Officer Sorrell observed most of Officer Williams's interaction with Mr. West from the passenger side of Mr. West's truck.[6]  Officer Sorrell testified that after Officer Williams walked to his patrol car to confer with dispatch, Mr. West "would commonly look

---

[4] Mr. West objects to the passage on page 4 of the report in which Judge Johnson explained that Mr. West handed Officer Williams the registration for a motorcycle because the report does not mention that Mr. West advised Officer Williams that the title was actually for his motorcycle. (Doc. 29, p. 25).  The Court sustains the objection.  As he was looking for proof of registration for his truck, Mr. West handed Officer Williams proof of registration for a motorcycle, but he immediately told Officer Williams that he handed him the bike registration by mistake.  (Doc. 33-1, p. 2).

[5] Mr. West objects to the fact that the background section in the magistrate judge's report does not mention that the video footage of the traffic stop does not corroborate statements from Officer Williams and Officer Sorrell to the effect that Mr. West was nervous and agitated, that his hands were shaking and his breathing heavy, and that he was "just flipping out."  (Doc. 29, p. 26).  The Court sustains the objection.  The video recording contradicts the officers' description of Mr. West's demeanor while he interacted with Officer Williams.  Mr. West did express frustration when Officer Williams instructed him to get out of the truck, but Officer Sorrell already had determined that there was a basis to search the truck when Mr. West complained about being asked to get out of his truck.  Despite the complaint, Mr. West remained calm while Officer Williams and Officer Sorrell placed him in handcuffs, and he cooperated when Officer Williams patted him down for weapons.  Mr. West did breathe heavily as he sat cuffed in Officer Williams's vehicle, but at that point, he was under arrest.

[6] Officer Sorrell is visible in the background of the recording from Officer Williams's body camera.  Mr. West objects to the fact that the background section of the magistrate judge's report does not "include the fact that Officer Sorrell conceded the point about Mr. West knowing he was standing next to the vehicle after originally testifying to the opposite on direct examination." (Doc. 29, p. 26; Doc. 33-1, p. 2).  The Court sustains the objection.  Officer Sorrell changed his testimony on this point over the course of the suppression hearing.

back in the rear-view mirror to look back to Officer Williams' location." (Doc. 22, pp. 88-89). Officer Sorrell also stated that Mr. West "was still nervously flipping through the papers [i]n the envelope." (Doc. 22, p. 89). "At one point," Officer Sorrell saw Mr. West place his right hand above the envelope. Officer Sorrell stated that Mr. West's "hand was closed, like he was clutching something, and he continued fumbling through the envelope." (Doc. 22, p. 89). Officer Sorrell stated that it appeared that Mr. West opened his hand and dropped "some kind of contraband" into the envelope. (Doc. 22, p. 90). Officer Sorrell then signaled Officer Williams to return to the truck.[7]

---

[7] Officer Sorrell's description of the moments before he believed he saw Mr. West drop something into the envelope varied over time. Officer Sorrell was not wearing a bodycam, so the only video evidence of Mr. West's conduct while Officer Williams was away from the pickup truck is captured in Officer Williams's dashcam video. That video shows Mr. West reaching over to the passenger seat at one point. (GX2, 4:33:04-11).

When Officer Williams returned to the pickup truck, according to the footage from his bodycam, Officer Sorrell stated that Mr. West removed an item from his pocket, and he rolled the item into the envelope. (GX1, 4:40). After Officer Sorrell made his initial search and found a packet of suspected methamphetamine, Officer Williams placed Mr. West in his patrol car and then joined Officer Sorrell in the search of the truck. With his bodycam still activated, Officer Williams asked Officer Sorrell what he saw. Officer Sorrell stated that he thought he saw Mr. West remove something from his pocket, but in retrospect, he thought Mr. West must have pulled something from the space between his seat and the center console. At the suppression hearing, Officer Sorrell testified that Mr. West was reaching around the center console, but he did not believe that Mr. West "went to the floorboard with his hand." (Doc. 22, p. 94). Based on the footage from Officer Williams's bodycam, it appears that it would be very difficult for Officer Sorrell to tell whether Mr. West removed something from his pant pocket or from the space between his seat and the center console. Therefore, the Court disregards Officer Sorrell's speculative testimony about the initial position of the item that Officer Sorrell believed he saw Mr. West drop into the envelope. The Court accepts Officer Sorrell's testimony that Mr. West was moving while he waited in his pickup truck, and the Court accepts Officer Sorrell's testimony that he believed he saw Mr. West place his hand above the large envelope and drop something into the envelope.

Officer Williams again approached the driver's side door of the pickup and instructed Mr. West to get out of the truck. As Mr. West stepped out of the truck, he continued to grasp the envelope. (GX1; Doc. 22, p. 96). Officer Williams instructed Mr. West to drop the envelope on the seat and "assisted him in dropping the envelope in the driver's seat." (Doc. 22, p. 96; GX1). Officer Williams and Officer Sorrell then placed Mr. West in cuffs. While Officer Williams conducted a pat down search of Mr. West, Officer Sorrell searched the truck. Because Officer Sorrell did not have a bodycam, the details of his search are not available, but he testified that he "look[ed] where [he] believed the item . . . could have been dropped . . . the driver's seat, the envelope was laying on the driver's seat and that is the first place." (Doc. 22, p. 98). Within 40 seconds, Officer Sorrell approached Officer Williams holding a small packet containing a white powdered substance. Officer Sorrell did not find a weapon during the initial search. (GX2, 4:34:18-57).

Judge Johnson found that when Officer Sorrell conducted the initial warrantless search of the pickup truck, neither he nor Officer Williams had probable cause to believe that Mr. West was engaged in criminal conduct. (Doc. 28, p. 24). Therefore, Judge Johnson reasoned, the initial search could withstand Fourth Amendment scrutiny only if Officers Williams and Sorrell reasonably suspected that Mr. West was armed and dangerous. Judge Johnson framed the constitutional issue this way:

The inquiry at bar devolves to a determination whether officers Sorrell and Williams had a reasonable belief, based on specific and articulable facts and the rational inferences therefrom, that West was dangerous and may have gained immediate control of a weapon. That is, the caselaw queries whether the totality of the circumstances evinces dangerous behavior by West.

(Doc. 28, p. 15). Judge Johnson concluded that "[g]iven the totality of the circumstances and the officers' articulable bases for the initial search, Eleventh Circuit caselaw commands a finding that the search was lawful in the matter at bar." (Doc. 28, p. 15). Judge Johnson rested his conclusion on the following analysis:

First and foremost, Sorrell observed West's hand movements when Williams returned to his squad car. According to Sorrell, West moved his hand variously from the area around his lap and the file jacket (which sat in West's lap) to the space between the driver's seat and the console, and also to the base of the driver's seat. Sorrell testified West's conduct may have indicated an attempt to access or conceal a weapon. West also continually glanced at his mirror in an effort to view Williams in his squad car.

Then, most peculiarly, Sorrell also observed West turn his closed, right hand over the file jacket, and then subsequently open his hand over the file jacket. Sorrell testified he did not see anything drop from West's hand, yet notably he testified that West could have concealed a small firearm in his hand, and the undersigned notes West could have concealed a knife in a clenched hand as well.

(Doc. 28, pp. 15-16).

Mr. West objects to Judge Johnson's finding; he argues that even if the officers reasonably suspected that he was armed, they could not also reasonably suspect that he was dangerous. (Doc. 29). Mr. West emphasizes that under *Long*,

before a law enforcement officer may conduct a protective search of a vehicle, the officer must "'possess an articulable and objectively reasonable belief that the suspect is potentially dangerous.'" (Doc. 29, p. 9 ) (quoting *Long*, 463 U.S. at 1051). Mr. West reasons that "if a person is armed, he or she is not necessarily dangerous," and a protective search in a state like Alabama must rest on a genuine suspicion that a detained individual is "presently dangerous" because so many individuals involved in traffic stops in Alabama are armed. (Doc. 29, pp. 9-11) (collecting persuasive authority for the proposition that "armed and presently dangerous" is a two-pronged, conjunctive standard and that the "presently dangerous" prong holds particular significance in states like Alabama that have permissive gun laws).[8]

The Court agrees that *Long*'s "armed and presently dangerous" standard consists of two independent elements, each of which must be satisfied for a protective search to pass constitutional muster. But under the circumstances of this case, the Court finds that the constitutional analysis is more complex than Mr.

---

[8] The authors of one scholarly journal, "Injury Prevention," have estimated gun ownership rates in each state. According to that study, 48.9% of adults in Alabama own a gun. Andy Kiersz and Brett LoGiurato, *Here's Where You're Most Likely to Own a Gun*, Business Insider (July 3, 2015), https://www.businessinsider.com/gun-ownership-by-state-2015-7 (last accessed Nov. 28, 2018) (citing Bindu Kalesan et al, *Gun Ownership and Social Gun Culture*, 22;3 INJURY PREVENTION 216 (2015)). Alabama's Attorney General does not release the number of guns registered within the state, but according to one estimate, Alabamians own 4,244,406 guns. Brandon Curtis, *How Many Guns Does Your State Have?* Concealed Nation (Jan. 3, 2016), http://concealednation.org/2016/01/how-many-guns-does-your-state-have-a-look-at-the-numbers-plus-comparisons-to-other-countries/ (last accessed Nov. 28, 2018) (relying on estimates extrapolated by an organization named Movoto).

West suggests, and the Court believes that the prevalence of firearms in Alabama cuts against Mr. West's argument regarding dangerousness.

In *Long,* the Supreme Court limited protective searches to "those areas in which a weapon may be placed or hidden," and the Supreme Court held that a law enforcement officer may search those areas only if he "possesses a reasonable belief based on specific and articulable facts" that an individual is dangerous and "may gain immediate control of weapons." *Long*, 463 U.S. at 1249. The protective search exception to the warrant requirement is designed to enable an officer "to neutralize the threat of physical harm" posed by someone who is "presently dangerous." 463 U.S. at 1047.

When Officer Williams ordered Mr. West to step out of his truck, cuffed him, and moved him to the rear of the truck, Officer Williams, at least temporarily, substantially minimized the possibility that Mr. West would gain immediate control of a weapon hidden in the truck and pose a threat to the officers or to anyone else. A number of courts have recognized that law enforcement officers may make a protective search for weapons inside a vehicle even after officers have ordered the occupants of a vehicle to step out of and away from the vehicle because the individuals may pose a danger to officers when the occupants return to the vehicle. In doing so, the courts have distinguished protective searches from searches incident to arrest.

In the latter scenario, "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search" because the police have secured the arrestee, then the justifications for a warrantless search-incident-to-arrest are absent. *Arizona v. Gant*, 556 U.S. 332, 339 (2009). Because an individual who has been detained but not arrested may have an opportunity to return to the area that law enforcement officers seek to search, the justification for a protective search remains even though the detainee, while separated from the vehicle, may not gain immediate control of a weapon hidden in the vehicle. As the Tenth Circuit Court of Appeals held in *United States v. Chambers*, "[t]he goal of a protective sweep is, in part, to secure a vehicle so that when the defendant is returned to the vehicle he is not likely to injure the officers. It is that distinction between a search incident to an arrest and a protective sweep that makes *Arizona v. Gant* inapplicable." 383 Fed. Appx. 719, 722 (10th Cir. 2010). Similarly, the district court in *United States v. Vandergroen* held that "*Gant* did not, however, address vehicle searches incident to a *Terry* stop, which the government refers to as a 'vehicle frisk,' where the suspect is detained pending investigation and is able to return to his car after the brief detention in the absence of probable cause to arrest." No. 18-CR-00133-PJH-1, 2018 WL 4053483, at *9 (N.D. Cal. Aug. 24, 2018).

Thus, pursuant to *Long*, if an officer removes an individual from a vehicle and detains him and if the officer reasonably believes that the individual is dangerous and may have a concealed weapon in the vehicle, then the officer may make a protective search of "those areas in which a weapon may be placed or hidden" if the individual "may gain immediate control" of a weapon hidden in those areas when he returns to the vehicle. *Long*, 463 U.S. at 1249. The question in this case is whether, based on his observations of Mr. West, Officer Sorrell reasonably could believe that Mr. West placed a weapon in the large envelope that he was holding such that Mr. West could gain immediate control of a weapon in the envelope if he were allowed to return to his truck. Judge Johnson found that Officer Sorrell could reach such a conclusion because Officer Sorrell testified that Mr. West "could have concealed a small firearm in his hand, Doc. 22 at 120, and the undersigned notes West could have concealed a knife in a clenched hand as well." (Doc. 28, p. 16; *see generally* Doc. 22, pp. 16-18). The Court very much respects Judge Johnson's thoughtful opinion, but the Court disagrees with his conclusion based on the undersigned's analysis of the evidence.

The Court would be much more apt to agree with Judge Johnson had Mr. West been holding an empty envelope or even a partially filled envelope. In either instance, Mr. West perhaps could have somewhat inconspicuously, with one hand, dropped a firearm or a knife into the 8 ½ by 11 envelope. But the record portrays a

different scenario. The video from Officer Williams's bodycam indicates that the envelope was full of papers. (GX1). If, as Officer Sorrell testified, he watched Officer Williams's initial interaction with Mr. West and he saw the envelope from which Mr. West was taking documents to provide to Officer Williams (Doc. 22, pp. 86-87), then Officer Sorrell would have known that the envelope was filled with papers. For Mr. West to drop a gun or a knife into the envelope, he would have had to hold the papers apart with one hand and drop the gun or knife in the envelope with the other hand. The effort would have been conspicuous and easily observed by Officer Sorrell. Significantly, although Officer Sorrell was carefully watching Mr. West while Officer Williams was in his patrol car, Officer Sorrell acknowledges that he did not see anything drop from Mr. West's hand into the envelope. Moreover, a gun, even one small enough to fit into Mr. West's closed fist, likely would make a visible impact on the envelope as it fell, and it would leave a bulge in the envelope. So would a knife. Officer Sorrell identified no change in the envelope after he saw Mr. West's hand open over the envelope. Nor did Officer Williams indicate or otherwise suggest to Officer Sorrell that he felt a weapon or the weight of a weapon in the envelope when he assisted Mr. West in dropping the envelope as Mr. West stepped out of his truck. Therefore, Officer Sorrell reasonably could believe that Mr. West tried to hide something in the envelope, but Officer Sorrell could not reasonably believe that Mr. West tried to

hide a gun or a knife in the envelope. Under *Long* then, Officer Sorrell could not search the envelope for a weapon.[9]

Were the Court to agree with Judge Johnson that Officer Sorrell reasonably suspected that Mr. West dropped a gun or a knife into the envelope, the Court would reject Mr. West's argument that he was not necessarily dangerous, particularly if he had managed to drop a gun into the envelope. The Court does not accept Mr. West's proposition that the prevalence of legal firearms in the state of Alabama somehow diminishes the threat that police officers and other members of society face when a law enforcement officer stops an individual who is armed with a gun. Guns are inherently dangerous, and no amount of licensing or training changes the fact that when a person fires a gun, an individual in the bullet's path likely will be injured or killed. Indeed, the United States Supreme Court has held that even an unloaded gun constitutes a "dangerous weapon" in part because "a gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous even though it may not be armed

---

[9] The envelope filled with papers is different from a closed CD binder large enough to enclose a weapon, *United States v. Harris*, 151 Fed. Appx. 882, 884 (11th Cir. 2005), or a cup, *United States v. Lopez*, 321 Fed. Appx. 65, 67 (2d Cir. 2009). (Doc. 28, pp. 17-18) (discussing objects in which an officer can maintain a reasonable belief that a weapon is hidden). Although the CD binder in *Harris* potentially could have been so full of CDs that a weapon would not fit, an officer would not know that until he opened the container. Here, the envelope was visibly full of papers.

at a particular time or place." *McLaughlin v. U.S.*, 476 U.S. 16, 17 (1986).[10]  In the words of Judge Wynn in his concurring opinion in *United States v. Robinson*, "individuals armed with firearms are categorically dangerous."  846 F.3d 694, 705 (4th Cir. 2017) (Wynn, J. concurring).[11]

Although the Court finds that Officer Sorrell could not reasonably suspect that Mr. West dropped a gun or a knife into the envelope, the Court believes that the totality of the circumstances gave Officer Sorrell probable cause to search the envelope for evidence of a crime, even though he did not have a warrant. "[P]robable cause means 'a fair probability that contraband or evidence of a crime will be found[.]'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)).  Officer Sorrell saw Mr. West watching Officer Williams in his rear view mirror, and he saw Mr. West reach somewhere

[10] In *McLaughlin*, the Supreme Court determined whether an unloaded handgun was a dangerous weapon "within the meaning of the federal bank robbery statute."  476 U.S. at 16 (citing generally 18 U.S.C. § 2113).  The language from the *McLaughlin* opinion quoted above applies with equal force in the analysis of dangerousness as it relates to the potential presence of a firearm during a traffic stop.

[11] Not all weapons are firearms, and not all items that may be weaponized are inherently dangerous.  Certain items become dangerous only when used for a violent purpose.

> The workman carrying home a linoleum knife earlier used in his work; the paring knife inadvertently left on an automobile floor after being used for a lawful purpose; a stevedore's hook or a fisherman's gaff thrown into a vehicle and forgotten. A 'weapon' could include a brick, a baseball bat, a hammer, a broken bottle, a fishing knife, barbed wire, a knitting needle, a sharpened pencil, a riding crop, a jagged can, rope, a screwdriver, an ice pick, a tire iron, garden shears, a pitch fork, a shovel, a length of chain, a penknife, a fork, metal pipe, a stick, etc.

*Wright v. New Jersey*, 469 U.S. 1146, 1149 n. 3 (1985) (Brennan, J. dissenting).  The inherent danger associated with firearms does not accompany other potential weapons.

with his right hand, lift a closed right fist above the envelope, and open his hand over the envelope. Although Officer Sorrell did not see what Mr. West may have dropped into the envelope, his training led him to believe that it was something that Mr. West did not want Officer Williams to find. Officer Sorrell testified that he believed that Mr. West was "trying to conceal or destroy something." (Doc. 22, p. 121). When Officer Williams instructed Mr. West to step out of the truck, Mr. West held the envelope until Officer Williams shook the envelope from his hand. (GX1). Based on Officer Sorrell's experience and training and his observations of Mr. West's conduct (i.e., the totality of the circumstances), Officer Sorrell could conclude that there was a fair probability that he would find contraband in the envelope. (Doc. 22, pp. 91-92, 97, 119, 125, 131-32).[12] Indeed, as Judge Johnson pointed out, Officer Sorrell searched the envelope for contraband, not for a weapon. (Doc. 28, p. 19). Officer Sorrell had probable cause to do so. Therefore, the Fourth Amendment does not prohibit the warrantless search of the envelope.[13]

_____

[12] As counsel for Mr. West pointed out at the suppression hearing, there potentially are innocent explanations for many of Mr. West's actions. But given the totality of the circumstances in this case, it was reasonable for Officer Sorrell to conclude that there was a fair probability that he would find contraband in the envelope.

[13] As Judge Johnson explained in his report, once Officer Sorrell found the small packet of suspected drugs, the officers had probable cause to continue to search the truck. (Doc. 28, pp. 27-28).

*II.     Miranda*

It is undisputed that after Officer Williams placed Mr. West under arrest, Officers Williams, Sorrell, and Hise (the third officer to appear at the scene of the traffic stop) questioned Mr. West about his possession and use of illegal drugs without advising Mr. West of his right to remain silent. "[F]ailure to give [*Miranda*] warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004). Therefore, the statements that Mr. West made to the officers are inadmissible unless an exception to *Miranda* applies in this case.

Judge Johnson recommended that the Court exclude all of Mr. West's statements other than his statement that the suspected heroin found in his truck was not cut with fentanyl. (Doc. 28, p. 38). Judge Johnson reasoned that the statement regarding fentanyl is admissible under *Miranda*'s public policy exception. (Doc. 28, pp. 27-38). Mr. West argues that the public policy exception does not apply in this case because the officers searching Mr. West's truck did not face an immediate danger. The Court agrees.

As Judge Johnson explained in his report, the United States Supreme Court recognized the public policy exception in *New York v. Quarles*. 467 U.S. 649 (1984). "The public-safety exception to *Miranda* allows officers to question a suspect without first providing *Miranda* warnings when necessary to protect

themselves or the general public." *United States v. Newsome,* 475 F.3d 1221, 1224 (11th Cir. 2007) (per curiam). The exception is a narrow one. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

The key to the exception is the immediacy of the danger and law enforcement officers' inability to control the potential danger, absent the information they seek. *Quarles*, 467 U.S. at 659, n. 8. Here, only law enforcement officers were at risk, and those three law enforcement officers had complete control of the situation and therefore could mitigate any potential danger.

Officer Sorrell asked Mr. West a series of questions about the possibility that "your heroin" might be cut with fentanyl because an officer searching Mr. West's truck could absorb fentanyl through contact while searching the truck. There is no doubt that fentanyl is extremely dangerous, and law enforcement officers must be cautious in their handling of fentanyl. But there was nothing in the circumstances of this case that prevented the officers from suspending their search of Mr. West's truck so that they could advise Mr. West of his rights before an officer questioned him about fentanyl. The drugs in Mr. West's truck were not going anywhere; Mr. West was the sole occupant of the truck, and when Officer Sorrell questioned Mr. West about fentanyl, Mr. West was handcuffed in the back of Officer Williams's patrol car. Nor was the truck going anywhere; the officers had complete control over it. If Mr. West had chosen to waive his rights, then Mr. West presumably

would have answered Officer Sorrell's questions about fentanyl. If Mr. West had refused to waive his rights, then the officers could have towed the truck to a secure location where they could have taken additional precautions for potential exposure to fentanyl if they felt that they could not safely search at the scene of the traffic stop. In fact, Officer Williams's bodycam video indicates that the officers initially planned to tow the truck. (GX1, 12:23-30) (referring to a tow sheet).[14] There was no emergency that required the officers to forego *Miranda* warnings to ensure officer safety. *See United States v. Brathwaite*, 458 F.3d 376, 382 n.8 (5th Cir. 2006).

Therefore, the Court sustains Mr. West's objection and excludes from evidence the discussion between Officer Sorrell and Mr. West concerning heroin and fentanyl.

**CONCLUSION**

Except as indicated above, the Court accepts Judge Johnson's recommendations. In sum, then, the Court denies Mr. West's motion to suppress with respect to the evidence identified during the warrantless search of Mr. West's pickup truck. The Court grants Mr. West's motion with respect to Mr. West's

---

[14] The officers changed their plans after Officer Sorrell questioned Mr. West about the fentanyl.

statements to Officers Sorrell and Hise; those statements are inadmissible.

**DONE** and **ORDERED** this November 28, 2018.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE